**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

MICHAEL WEBB,

Plaintiff,

9:23-cv-1577
(ECC/PJE)

v.

ERIC M. FESSETTE, et al.,

Defendants.

---

**Appearances:**

Michael Webb, *Pro se Plaintiff*
Olivia R. Cox, Asst. Att'y General, *for Defendants*

**Hon. Elizabeth C. Coombe, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I. INTRODUCTION

Pro se Plaintiff Michael Webb, an inmate in the custody of the New York State Department of Corrections and Community Supervision (DOCCS), commenced this civil rights action under 42 U.S.C. § 1983 alleging that the Defendants violated the Eighth Amendment by subjecting Plaintiff to excessive force and failing to intervene while Plaintiff was an inmate at Clinton Correctional Facility. Dkt. No. 1.

On March 26, 2024, the Defendants filed a pre-answer motion for summary judgment seeking dismissal of Plaintiff's claims based on the failure to exhaust available administrative remedies as required by the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a). Dkt. No. 17. In a September 23, 2025 Memorandum-Decision and Order, this Court denied Defendants' motion as premature and granted Defendants leave to file a renewed motion for summary judgment

and/or request permission to hold an exhaustion hearing upon completion of discovery on the exhaustion issue. Dkt. No. 40. The parties engaged in limited discovery, and on December 15, 2025, Defendants filed a letter motion requesting permission to hold an exhaustion hearing. Dkt. Nos. 46, 47, 48. The Court granted Defendants' request and appointed pro bono counsel for Plaintiff. Dkt. No. 49. On May 15, 2026, the Court held an evidentiary hearing. The parties submitted pre- and post-hearing briefs. Dkt. Nos. 64, 65, 78, 79. For the reasons set forth below, the Court finds that the grievance procedures were unavailable to Plaintiff and that his claims are therefore not barred by the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a) based on a failure to exhaust administrative remedies.

## II. BACKGROUND[1]

Plaintiff alleges that on May 5, 2021, at approximately 7:50 a.m., Defendants Sergeant (Sgt.) John Doe #1, Sgt. John Doe #2, and Sgt. Fessette "were acting supervisors in charge and responsible for all corrections officers" involved in "pat frisks occurring in the upper (H) corridor and the . . . upper (F) rotuna [sic] utilizing the cell sense machine[.]" Dkt. No. 1 at 4. These officials were stationed "outside of (6) company observing the inmates as they . . . were stopped by an officer at the doorway" and directed to "stop in front of the cell sense machine[.]" *Id.* "As plaintiff was directed to stop in front of the cell sense machine[,]" he looked back and noticed "an animated John Doe #1 pointing him out to defendants [Corrections Officers (CO)] Mullady, Fittin, Bell, and Minckler[.]" *Id*. at 4-5. Plaintiff then "approached and stopped in front of the cell sense machine," at which time Sgt. Fessette yelled, "you go get pat frisked f[ir]st." *Id*. at 5.

[1] This summary of Plaintiff's allegations is taken from the Court's January 23, 2024 Decision and Order. *See* Dkt. No. 7 at 4-6.

Plaintiff stepped out of line to be pat frisked, after which point he "was directed to return to the cell sense machine and stop in front of it[.]" Dkt. No. 1 at 5. Upon doing so, Sgt. Fessette "directed plaintiff to surrender[ ] his identification [card] and after looking it over stated, 'you don't li[k]e the way I am running my [expletive] prison[.]'" *Id*. "[W]ithout any provocation[,]" Sgt. Fessette then "punched plaintiff . . . with a closed fist." *Id*. When Plaintiff bent down to retrieve his eyeglasses, CO Bell "tackled him . . . into [CO] Fittin[,] who grabbed hold of plaintiff before they hit the grabage [sic] bin and fall [sic] to the ground." *Id*. While CO Fittin "maintain[ed] his hold on plaintiff, [CO] Mullady took his baton and repeatedly beat plaintiff on the top of his head[.]" *Id*.

Eventually, Sgt. Fessette ordered COs Bell and Fittin to "release plaintiff and . . . let him get up." Dkt. No. 1 at 5. "As plaintiff made it to one knee, [Sgt.] Fessette maliciously and unwarrantly [sic] kicked plaintiff in his rigth [sic] rib cage causing extreme pain [and] difficulty breathing and moving." *Id*.

Thereafter, Plaintiff was escorted to the infirmary, where he received treatment for a head wound. Dkt. No. 1 at 5. Plaintiff was then escorted to the Special Housing Unit (SHU), and eventually issued a misbehavior report authored by Sgt. Fessette, which charged him with several rules violations based on false statements. *Id*. Plaintiff was found guilty of the charges in the misbehavior report and sentenced to forty-five (45) days of SHU confinement. *Id*.

## III. DISCUSSION

### A. Exhaustion of Administrative Remedies

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42

U.S.C. § 1997e(a); *see also Ross v. Blake*, 578 U.S. 632, 635 (2016). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007) (citing *Porter*, 534 U.S. at 524).

"To properly exhaust his administrative remedies, an inmate must complete the administrative review process in accord with the applicable state procedural rules." *Ellis v. Riquier*, No. 9:17-cv-00577 (BKS/DJS), 2022 WL 523746, at *2 (N.D.N.Y. Feb. 22, 2022) (citing *Jones*, 549 U.S. at 218-19). DOCCS's inmate grievance process is set forth in 7 N.Y.C.R.R. § 701 et seq. The incarcerated individual must first file a grievance with the Incarcerated Grievance Resolution Committee (IGRC). 7 N.Y.C.R.R. §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee (CORC). *Id.* § 701.5(d). Regulations governing the Incarcerated Grievance Program (IGP) encourage an incarcerated individual to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a).

Because "[a]llegations of employee harassment are of particular concern," there is an expedited procedure for harassment grievances. 7 N.Y.C.R.R. § 701.8. Such grievances are forwarded directly to the Superintendent, who determines "whether the grievance, if true, would represent a bona fide case of harassment." *Id.*; *see also Torres v. Carry*, 691 F. Supp. 366, 369-70 (S.D.N.Y. 2009). If the grievance presents a "bona fide harassment issue," "then the

superintendent must initiate an investigation, render a decision on the grievance, and inform the inmate of the decision within 25 days of receipt of the grievance." *Williams v. Priatno*, 829 F.3d 118, 120 (2d Cir. 2016); 7 N.Y.C.R.R. §§ 701.8(d), (f). The Superintendent's decision may be appealed to CORC by filing a "notice of decision to appeal form (Form 2133)" with "the inmate grievance clerk within seven calendar days of receipt of that response." *Id.* § 701.8(h). However, "[i]f the superintendent fails to respond within the required 25-day time limit the grievant may appeal his/her grievance to [CORC]." *Id.* § 701.8(g).

While the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 578 U.S. at 642. Specifically, the exhaustion requirement contained in § 1997e(a) "hinges on the 'availability' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Id.* (citing 42 U.S.C. § 1997e(a)). In *Ross*, the Supreme Court identified three circumstances in which a court may find administrative remedies are not "available" for PLRA purposes, holding:

> [A]n administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates . . . . Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use . . . . And finally, . . . when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.

*Id*. at 643-44. In these situations, exhaustion is not required. Further, the Second Circuit has observed "the three circumstances discussed in *Ross* do not appear to be exhaustive . . . ." *Priatno*, 829 F.3d at 124 n.2.

Because the failure to exhaust administrative remedies is an affirmative defense, the defendant bears the burden of showing that an incarcerated individual has failed to satisfy the exhaustion requirements. *See Jones*, 549 U.S. at 216. Then the plaintiff must establish the

administrative review process was unavailable to him under *Ross*. *See id*. "[W]hile the burden of production may shift to a plaintiff when a court considers whether the grievance process was unavailable, the ultimate burden of proof with respect to the exhaustion defense remains, at all times, with the defendant." *Hudson v. Kirkey*, No. 9:20-cv-0581 (LEK/DJS), 2021 WL 1966721, at *3 (N.D.N.Y. May 17, 2021) (citing *Coleman v. Nolan*, No. 9:15-cv-0040, 2018 WL 4732778, at *4 (N.D.N.Y. Oct. 2, 2018)) (alteration in original).

**B. Evidence Regarding Exhaustion**

It is undisputed that a grievance procedure existed at Clinton Correctional Facility (Clinton) and Woodbourne Correctional Facility (Woodbourne) at the time of the underlying incident. The following facts are additionally undisputed: Plaintiff was incarcerated at Clinton on May 5, 2021. On May 17, 2021, Plaintiff filed a timely grievance with respect to an alleged assault that took place on May 5 at Clinton. Plaintiff's grievance was initially dismissed by the IGRC, but the dismissal was in error and Plaintiff's grievance was ultimately submitted to the Superintendent of Clinton on June 8, 2021. Plaintiff was subsequently transferred to Woodbourne on June 24, 2021. While at Woodbourne, Plaintiff received the Clinton Superintendent's decision denying his grievance.

It is further undisputed that CORC never received an appeal of the Superintendent's decision. The issue presently before the Court is whether the evidence establishes that the grievance process was "unavailable" to Plaintiff, resulting in his failure to appeal the Superintendent's decision to CORC and fully exhaust his administrative remedies. The following represents a summary of the relevant testimony and evidence on this issue, presented at the May 15, 2026 hearing.

**1. Defendants' Witnesses**

**a. Rachael Sequin**

Rachael Sequin is employed by DOCCS as the director of the IGP. Dkt. No. 75 at 7. Sequin testified that an incarcerated individual has seven days to appeal a Superintendent's decision to CORC. *Id.* at 14. The incarcerated individual must complete the "appeal section" located at the bottom of the Superintendent's decision, and submit that document back to the grievance office at the facility where the grievance was filed. *Id.*, *see also* Def. Exh. 5 (8/18/21 Superintendent's Decision). If an incarcerated individual is transferred to another facility sometime after filing a grievance, he is required to mail an appeal back to the grievance office at the facility where he filed the original grievance. Dkt. No. 75 at 17. Upon receipt of an appeal of a Superintendent's decision, the receiving facility prepares a "case history and record," containing the relevant documents and information pertinent to the grievance, and sends it to CORC by interagency mail. *Id.* at 16.

If an incarcerated individual filed an appeal at a facility to which he was subsequently transferred, Sequin testified that the grievance supervisor at the subsequent facility would return the appeal to the incarcerated individual and direct him to submit the appeal to the grievance office at the facility where he originally filed the grievance. Dkt. No. 75 at 18. Sequin further testified that an incarcerated individual can "reach out" to the grievance supervisor at the facility where the grievance was filed, to confirm that the appeal was received and filed with CORC. *Id.* Alternatively, an incarcerated individual can send a letter to CORC asking whether an appeal has been filed. *Id.*

Sequin testified that according to DOCCS records, Plaintiff appealed 172 grievances to CORC between 1990 and 2024. Dkt. No. 75 at 25.

**b. Donna Wilcox**

Donna Wilcox is employed by DOCCS as the IGP Supervisor at Clinton. Dkt. No 75 at 37-38. Wilcox testified that incarcerated individuals learn about the IGP during orientation, when an IGRC clerk speaks to them, and they receive orientation manuals. *Id.* at 40. Incarcerated individuals also have access to a law library, where information about the IGP can be found. *Id.* Wilcox testified that the IGP office at Clinton is made up of the IGP Supervisor, a grievance sergeant, two "reps" from the incarcerated population who are elected to their positions, and one clerk, also an incarcerated individual, who is assigned to the position. Dkt. No. 75 at 41-42.

Wilcox testified that an incarcerated individual who has been transferred out of Clinton, but is seeking to appeal a Superintendent's decision on a grievance filed at Clinton, must complete the appeal section of the decision and send it back to Clinton through the facility mail. Dkt. No. 75 at 49. IGP Supervisors can make exceptions for late appeals if there are mail issues or if the incarcerated individual has been out of the facility on a court or medical trip. *Id.* at 48-49.

Wilcox testified that she was not the IGP Supervisor at Clinton when Plaintiff was housed there in 2021. Dkt. No. 75 at 50. According to her review of DOCCS records, a Superintendent response and decision was issued in August 2021 denying Plaintiff's grievance concerning the underlying assault. *Id.* at 58; Def. Exh. 5. According to Wilcox, to appeal this decision Plaintiff was required to complete the appeal statement on the bottom of the decision and return it in the facility mail to the originating facility, i.e. Clinton. Dkt. No. 75 at 58.

DOCCS's records also include a September 8, 2021 letter from Plaintiff addressed to the IGRC Supervisor at Clinton, with the subject line "Correspondence department blatantly refuses to mail out grievance appeal address [sic] to Clinton IGRC supervisor." Dkt. No. 75 at 59-60; Def.

Exh. 6 (Plaintiff's September 8, 2021 Letter to Clinton). The letter is stamped as "received" on September 14, 2021. *Id.* It states:

> Please be advised that since August 24, 2021 I have been placing my grievance appeal [] in the mailbox here at the Woodbourne Correctional Facility only to have it returned to me days later. Today is the fourth time that the IGRC or inmate correspondence program has returned this grievance appeal to me, therefore, I'm respectfully requesting an exception to the time limit under Directive 4040 § 701.6(g).

Def. Exh. 6. Wilcox testified that in her experience, mailing difficulties at a facility were considered a basis to grant an extension of time to file an appeal. Dkt. No. 75 at 60. Wilcox further testified that, if Plaintiff had enclosed his appeal in the same envelope as this letter, it would have been filed with CORC. *Id.* at 60-61.

Defendants also produced a September 14, 2021 Memorandum sent to Plaintiff from the Clinton IGP Supervisor with the subject line "Correspondence dated 9/8/21." Def. Exh. 7 (September 14, 2021 Memo). The Memorandum states:

> In accordance with Directive #4040, section 701.6, (h) (2) An inmate transferred to another facility may continue an appeal of any grievance. If the grievant wishes to appeal, he or she must mail the signed appeal form back to the IGP supervisor at the facility where the grievance was filed. Therefore, you need to send your grievance appeal directly to the IGP office at Clinton C.F.

Def. Exh. 7. Wilcox testified that based off of her review, the purpose of this Memorandum was to inform Plaintiff that his appeal was not received and thus could not be processed. Dkt. No. 75 at 61. Based upon her review of DOCCS records, Wilcox testified that Plaintiff did not attempt to appeal his grievance to the next step based on the untimeliness of a response, nor did he send any letters requesting the status of his appeal to CORC. *Id.* at 62.

**c. Casey Witthohn**

Casey Witthohn is employed by DOCCS as a correctional sergeant at Woodbourne. Dkt. No. 75 at 71. Witthohn testified that Woodbourne has two different styles of housing: "blocks,"

i.e. individual cells with a single occupant, and dorms comprised of cubicles with a bed and locker. *Id.* at 73. D Block is one of the four cell blocks at Woodbourne. *Id.* Each floor of D Block contains a mailbox for outgoing mail mounted to the wall. *Id.* at 74. The mailbox is secured by a padlock. *Id.* During the day shift, an officer picks up mail from each mailbox and delivers it to the mailroom. *Id.* Only the designated officer collecting mail has access to the contents of the mailbox. *Id.* at 75. Incarcerated individuals do not have the ability to access the contents of a locked mailbox. *Id*. Once the mail is collected, it is brought to the mailroom located at the front of Woodbourne, outside the access of the incarcerated population. *Id.* at 76. There, the bag of mail is "handed to the individual responsible for the mailroom[,]" a civilian employee. *Id.* at 76-77. Security staff's only other involvement with outgoing mail is to occasionally carry mail bins to a van. *Id.* at 77.

Witthohn testified that the Woodbourne IGP would not be involved in the mailing of a letter from an incarcerated individual to the Clinton IGP, nor would the Woodbourne IGP have access to any such mailing. Dkt. No. 75 at 78. He is not aware of any incidents of DOCCS employees destroying or interfering with an incarcerated individual's mail in a mailbox. *Id.* at 79. Witthohn testified that interference with the facility mail in such a manner could subject a DOCCS employee to discipline as well as criminal charges. *Id.* at 79-80.

**d. Peter Duncan**

In 2021, Peter Duncan was employed by DOCCS as the IGP Supervisor at Woodbourne. Dkt. No. 75 at 88. Duncan testified that the Woodbourne mailroom employees would place correspondence addressed to the Woodbourne IGP in a box labeled for Duncan, which he picked up every morning from the mailroom. *Id.* at 110. Duncan denied that a correspondence addressed to another facility's IGP office ever mistakenly reached the Woodbourne IGP office. *Id.*at 110.

Duncan testified that if a correspondence addressed to another facility's IGP office was received by the Woodbourne IGP office by mistake, he would have it returned to the incarcerated individual, either personally or through an incarcerated individual representative. *Id.* at 112-13. Duncan would not send it back to the mailroom. *Id.* at 113.

Duncan testified that the Woodbourne IGP would not receive appeals addressed to Clinton IGP, nor would the Woodbourne IGP be involved in the routing of an appeal to Clinton. *Id.* at 96. If an incarcerated individual intended to appeal a grievance determination from Clinton, but addressed their appeal to Woodbourne IGP, Duncan testified that upon observing that it was an appeal from Clinton and had nothing to do with Woodbourne's IGP program, either he or an incarcerated individual representative would "return that information to the incarcerated individual." *Id.* at 97-99. The Woodbourne IGP would never accept an appeal of a grievance filed at Clinton. *Id.* at 98. Duncan agreed that an incarcerated individual must rely on DOCCS staff to process their correspondence through the mail, and cannot personally deliver appeal paperwork to other DOCCS facilities. *Id.* at 107. An envelope submitted in the mail at Woodbourne merely addressed to the IGP program, without more, would be directed to Duncan at the Woodbourne IGP. *Id.* at 117-18.

Duncan testified that he is not familiar with Plaintiff, and does not recall past conversations with Plaintiff regarding grievances. Dkt. No. 75 at 100-01. Duncan is not aware of any complaints that Plaintiff filed against him in 2021. *Id.* at 117.

**e. Megan Nolan**

Megan Nolan was previously employed by DOCCS as an office assistant in the Woodbourne mailroom. Dkt. No. 75 at 130. Nolan testified that Woodbourne had a functioning mailroom in 2021, with specific directives governing how staff handled incarcerated individuals'

privileged and regular correspondence. *Id.* at 131-32. Grievance appeals are considered privileged correspondences. *Id.* at 133. Incarcerated individuals do not have free access to the mailroom at Woodbourne. *Id.* Mail is delivered from the housing unit mailboxes to the mailroom by a security officer in a locked bag. *Id.* at 134-35. Correspondence mailed by incarcerated individuals require an addressee's "full proper name and full proper address," including a receiving facility's "name, the department of where they want it to go to, and the facility's full address." *Id.* at 136-37. If a mailroom employee noticed an incorrectly addressed envelope, they would send the mail back to the incarcerated individual with a checklist explaining why their mail was not processed. *Id.* at 137. An envelope addressed to the IGP at Clinton would be processed for outgoing mail as long as it was fully addressed. *Id.* at 140. Nolan testified that she is not aware of any incarcerated individual's grievance correspondence meant for an outside facility's IGP office mistakenly being sent to the Woodbourne IGP. *Id.* at 151-52.

**2. Plaintiff**

Plaintiff testified that he received the Clinton Superintendent's decision denying his grievance while he was incarcerated at Woodbourne. Dkt. No. 75 at 167, 187; Plt. Exh. 6 (8/18/21 Superintendent Decision). Plaintiff filled out and signed the appeals statement at the bottom of the decision in order to "submit[] an appeal because [he] disagreed with" the Superintendent's decision. *Id*. at 167-68. Plaintiff only had access to the one form on which to appeal the Superintendent's decision. *Id.* at 168. He put the appeal in the mailbox on his "company" at Woodbourne. *Id.* The envelope was addressed to the "IGRC Supervisor at Clinton." *Id.* at 168-69, 188. A couple of days later, a Woodbourne IGRC representative, an incarcerated individual, returned the envelope back to Plaintiff and stated that the Supervisor told him to return the envelope to Plaintiff. *Id.* at 169. Plaintiff put the appeal in a new envelope with the same address

and "put it right back in the mailbox," but it was once again returned to Plaintiff by another Woodbourne IGRC representative. *Id.* at 170, 191. This time, the IGRC representative "just hand[ed] it to [Plaintiff] and left." *Id.* at 171. Plaintiff went to the IGRC and confronted Duncan, asking him "why he ke[pt] . . . intercepting [Plaintiff's] mail." *Id.* Duncan "instructed [Plaintiff] that [he] needed to address the appeal to the IGRC where it initially came from[.]" *Id.* at 190. Plaintiff called Duncan "a couple names, . . . and [] wrote him up to the Superintendent" of Woodbourne. *Id.* at 172, 179, 181. Plaintiff attempted to mail his appeal to Clinton four times. *Id.* at 171-72. Each time, Plaintiff put the appeal in a new envelope because "he had to make sure that the appeal was in there." *Id.* at 191.

Plaintiff testified that he included his appeal in the letter he sent to Clinton on September 8, 2021. Dkt. No. 75 at 180. Plaintiff did not respond to the September 27, 2021 letter, because his "appeal . . . was already filed by then[.]" *Id.* at 181. He never wrote a letter to the Clinton IGP to confirm they had received his appeal and filed it with CORC. *Id.* at 194.

**C. Analysis**

Regarding the first step of the exhaustion analysis, as previously explained Defendants have established that Plaintiff failed to fully exhaust his administrative remedies by appealing his grievance to CORC. Although Plaintiff testified that he completed the appeal section of the Superintendent's decision and mailed it to the Clinton IGP for processing, CORC records reveal that no appeal was received. Accordingly, Plaintiff failed to exhaust his administrative remedies under the DOCCS IGP prior to commencing this action. See 7 N.Y.C.R.R. § 701.5(d); *see also, e.g., Shabazz v. Bailey*, No. 9:20-cv-0057 (LEK/TWD), 2023 WL 5779533, at *5 (N.D.N.Y. June 28, 2023) ("Plaintiff's failure to appeal [his] grievance . . . to CORC means Plaintiff failed to

properly exhaust his administrative remedies before filing this action."), *report and recommendation adopted*, 2023 WL 5622049 (N.D.N.Y. Aug. 31, 2023).

The remaining inquiry is whether grievance procedures were available to Plaintiff. As previously explained, an incarcerated individual's failure to properly exhaust administrative remedies does not preclude an action under § 1983 where the process was unavailable because it operated as a dead end, was so opaque that it became incapable of use, or where prison officials thwarted an incarcerated individual's efforts to utilize the grievance process. *See generally, Ross*, 578 U.S. at 643-44.

There is no dispute that Plaintiff is well versed in the DOCCS IGP process, having successfully appealed over 170 grievances to CORC while in DOCCS custody. Although specific testimony on the issue was not offered at the hearing, the exhibits offered by the parties suggest that Plaintiff has previously appealed to CORC from a facility to which he was transferred after filing an initial grievance. *Compare* Plt. Exh. 4 (Facility Placement Sheet) *with* Def. Exh. 9 (Plaintiff's CORC History). Regarding the underlying appeal at issue, Plaintiff provided detailed testimony at the hearing regarding his receipt of the Superintendent's decision at Woodbourne, completion of the appeals statement, and efforts to ensure that his appeal was placed in the Woodbourne mail system to be sent to Clinton. Moreover, Plaintiff consistently testified that each time he attempted to mail out his grievance, he placed it in an envelope and addressed it to the Clinton IGRC. Although Plaintiff could not produce copies of the appeal or mailing envelopes, the fact that Plaintiff's September 8, 2021 letter is properly addressed to the Clinton IGRC supports Plaintiff's testimony on this issue. Evidence that Plaintiff subsequently complained to the Woodbourne Superintendent also supports his position that he was having problems with the delivery of his mail to Clinton, despite his efforts to properly appeal. This evidence, considered

in its totality, is credible support for Plaintiff's position that he knew how to appeal a grievance filed at a different facility, and attempted to follow these same procedures in appealing the underlying Superintendent's decision to Clinton.

Defendants did not produce any witnesses or documentary evidence directly refuting Plaintiff's claim that he completed the appeals section of the Superintendent's decision, properly addressed it to the Clinton IGRC, and placed it in the mailbox on his company at Woodbourne. Defendants merely maintain that, "had Plaintiff correctly addressed his grievance appeal to Clinton IGP, it would have been mailed to Clinton IGP." Dkt. No. 78 at 6. In other words, Defendants ask the Court to assume the infallibility of DOCCS's mailing system, and on that basis alone disregard Plaintiff's testimony and evidence. On this issue, Duncan testified that the Woodbourne mailroom never mistakenly received correspondence addressed to another facility's IGP. Dkt. No. 75 at 110. This testimony is afforded limited credibility, however, as at least one other witness for the Defendants recognized that mailing issues could occur and form the basis for an extension of time to file an appeal. *See* Dkt. No. 75 at 60. Moreover, Duncan's testimony that human error never occurred in this regard defies reasonableness. On the other hand, Duncan testified that if such an error did occur, it would be his practice to return the correspondence to the incarcerated individual, *see id.* at 112-13 – essentially thwarting the incarcerated individual's otherwise proper efforts to use the facility mail.

Defendants also argue that, even crediting Plaintiff's testimony, Plaintiff's failure to take "further action to confirm whether Clinton IGP had a copy of his grievance appeal" defeats his claim of unavailability. Dkt. No. 78 at 6. Defendants cite to the relevant provision of Directive 4040 stating "[i]f a grievant does not receive a copy of the written notice of receipt within 45 days of filing an appeal, the grievant should contact the IGP supervisor in writing to confirm that the

appeal was filed and transmitted to CORC." *Id.* However, crediting Plaintiff's version of the events, he *repeatedly* sent correspondence to the Clinton IGP attempting to secure his appeal to CORC, including the September 8, 2021 letter explaining his difficulties with mailing the appeal to Clinton, and it was not unreasonable for Plaintiff to believe that by the time he received the September 27 correspondence from the Clinton IGP Supervisor, his appeal was already submitted and filed. In any event, Defendants have not established that Plaintiff was familiar with this provision of Directive 4040, nor have they provided evidence that this is "part of any official grievance process." *Stephanski v. Allen*, No. 9:18-cv-0076(BKS/CFH), 2020 WL 7248457, at *8 (N.D.N.Y. Dec. 9, 2020); *see also Foskey v. Paige*, No. 9:20-cv-0504 (LEK/TWD), 2024 WL 2880715, at *9 (N.D.N.Y. Mar. 4, 2024), *report-recommendation adopted*, 2024 WL 2109150 (N.D.N.Y. May 10, 2024) (rejecting defendants' contention that Plaintiff should have written to CORC to ensure receipt of his appeal to fully exhaust his administrative remedies on similar basis).

Other courts in this Circuit have concluded that where "[t]he evidence demonstrates that Plaintiff's grievances were not filed, even though he mailed his grievances in accordance with the IGP," and "Plaintiff did not know why his grievances were not filed, but once he mailed them, they were within DOCCS' possession and out of Plaintiff's control," that "the grievance process became unavailable to Plaintiff, thereby excusing him from pursuing further exhaustion requirements." *Jenkins v. Cordero*, No. 17 Civ. 1592, 2019 WL 2121655, at *5 (S.D.N.Y. May 15, 2019); *see also Curtis v. Bola*, No. 15 Civ. 718 (GLS/TWD), 2017 WL 6767392, at *13 (N.D.N.Y. Nov. 28, 2017), *report-recommendation adopted*, 2018 WL 278673 (N.D.N.Y. Jan. 3, 2018) (PLRA did not bar plaintiff's claims where he mailed his grievance in accordance with the IGP "and for reasons unknown to him and through no fault of his own, those [grievances] did not end up in the IGP files."). Because the Court finds Plaintiff's testimony concerning his efforts to

properly mail his appeal credible, and in the absence of any credible evidence directly refuting Plaintiff's testimony in this regard, the Court concludes that the grievance process became unavailable to Plaintiff under these similar circumstances. Accordingly, Plaintiff's § 1983 claims are not barred by the PLRA for failure to exhaust administrative remedies.

## IV. CONCLUSION

For these reasons, it is hereby

**ORDERED,** that the administrative remedies under DOCCS IGP were rendered unavailable to Plaintiff with regard to the underlying grievance, and Plaintiff's claims are therefore not barred by the PLRA based upon his failure to exhaust, and it is further

**ORDERED** that this matter is referred to the Magistrate Jude for further proceedings consistent with this Memorandum-Decision and Order; and it is further

**ORDERED** that the Clerk serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: October 22, 2026

Elizabeth C. Coombe
U.S. District Judge